## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ANITA L. GRIGGS,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:15-cv-619
Barrett, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's application for supplemental security income (SSI). This matter is before the Court on

plaintiff's Statement of Errors (Doc. 13) and the Commissioner's response in opposition (Doc.

18).

### I. Procedural Background

Plaintiff protectively filed her application for SSI in December 2011, alleging disability

since June 15, 2011, due to chronic obstructive pulmonary disease (COPD), asthma, anxiety and

bipolar disorder. (Tr. 252). Plaintiff's application was denied initially and upon reconsideration.

Plaintiff, through counsel, requested and was granted a *de novo* hearing before administrative

law judge (ALJ) Larry A Temin. Plaintiff and a vocational expert (VE) appeared and testified at

the ALJ hearing. On July 23, 2014, the ALJ issued a decision denying plaintiff's SSI

application. Plaintiff's request for review by the Appeals Council was denied, making the

decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform

the relevant previous employment, the burden shifts to the Commissioner to show that the

claimant can perform other substantial gainful employment and that such employment exists in

the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th Cir.

1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] has not engaged in substantial gainful activity since December 15, 2011, the application date (20 CFR 416.971 *et seq.*).

2. The [plaintiff] has the following severe impairments: chronic obstructive pulmonary disease and asthma; coronary artery disease, status post non-ST segment elevation myocardial infarction; obesity; a mood disorder; and an anxiety disorder (20 CFR 416.920(c)).

3. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a). Specifically, the [plaintiff] can perform work activity except as follows: The [plaintiff] can lift, carry, push, pull up to ten pounds occasionally and five pounds frequently. She can stand and/or walk for up to two hours total in an eight-hour workday (for thirty minutes at a time, and then she must be able to sit for five minutes). She can sit for up to six hours in an eight-hour workday. The [plaintiff] can only occasionally stoop, kneel, crouch, and climb ramps or stairs. She should never crawl, climb ladders/ropes/scaffolds, or work at unprotected heights or around hazardous machinery. The [plaintiff] must avoid concentrated exposure to heat, extreme cold, high humidity, fumes, noxious odors, dusts, or gases. The [plaintiff] must also be able to use supplemental oxygen during the workday. Mentally, the [plaintiff] is able to perform only simple, routine, repetitive tasks. She is able to sustain concentration and attention for two hours at a time and then requires a rest break of five minutes. The [plaintiff]'s job should not require more than superficial interaction with the general public, coworkers, or supervisors. The [plaintiff]'s job should not require more than ordinary and routine changes in work setting or duties.

5. The [plaintiff] is unable to perform any past relevant work (20 CFR 416.965).[1]

6. The [plaintiff] was born [in] . . . 1970 and was 41 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled (20 CFR 416.968).

9. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 416.969 and 416.969(a)).[2]

10. The [plaintiff] has not been under a disability, as defined in the Social Security Act, since December 15, 2011, the date the application was filed (20 CFR 416.920(g)).

(Tr. 71-88).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C.

§405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1] Plaintiff's past relevant work was as a fast food worker, a light, unskilled position which plaintiff performed up to the medium exertion level. (Tr. 87).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as production worker (250 jobs in the region and 36,000 jobs in the nation), stock material laborer (200 jobs in the region and 30,000 jobs in the nation), machine operator/tender/feeder (200 jobs in the region and 26,000 jobs in the nation), inspector (100 jobs in the region and 13,500 jobs in the nation), and packer (200 jobs in the region and 18,000 jobs in the nation). (Tr. 88).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

In her Statement of Errors, plaintiff argues that the ALJ erred by: (1) improperly

weighing the opinion of her treating physician, Dr. Oluwole Onadeko, M.D., which the ALJ gave

only "some weight;" (2) failing to analyze whether plaintiff's breathing impairment equaled

Listing 3.02; and (3) failing to properly weigh the opinion of the psychological consultative

examiner, Dr. Kevin L. Corbus, Psy.D., which the ALJ gave only "some weight." (Doc. 13).[3]

### 1. The ALJ's Step Three analysis (Second assignment of error)

Plaintiff alleges that the ALJ erred at Step Three of the sequential evaluation process by

---

[3] The Court will consider the assignments of error in a different order than plaintiff has presented them.

failing to discuss "equaling [of the Listing] in any capacity." (Doc. 13 at 17, citing Tr. 72).

Plaintiff alleges that substantial evidence supports a finding that her respiratory impairment

equals Listing 3.02, 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Doc. 13 at 17). To satisfy Listing 3.02

for COPD, the claimant must suffer from "[c]hronic obstructive pulmonary disease, due to any

cause, with the $FEV_1$[4] equal to or less than the values specified in table I corresponding to the

person's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02, App. 1, § 3.02A.[5]

Plaintiff alleges that the $FEV_1$ values generated on pulmonary testing show that her respiratory

impairment is "quite close" to meeting Listing 3.02. (Doc. 13 at 17). Plaintiff specifically

contends that her test results satisfied the listing value threshold of 1.25 based on her height

(64"-65") on several dates.[6] (*Id.*, citing Tr. 410, 4/23/12; 418, 6/19/12; Tr. 586, 2/26/13; Tr. 686,

1/29/14). She further contends that the $FEV_1$ value of 1.26 reported on June 4, 2014, slightly

exceeded the applicable listing level. (*Id.*, citing Tr. 770). As further evidence that her

respiratory impairment equals the Listing, plaintiff alleges that the results of two 6-minute

walking tests demonstrate "severe breathing problems" (Tr. 553, 691); the record includes

numerous abnormal findings on pulmonary examination, including decreased breath sounds,

---

[4] "'$FEV_1$ is the acronym for 'Forced Expiratory Volume in the First Second.' FEV test results are expressed in liters." *Becker v. Astrue*, No. 11-cv-438, 2012 WL 2504050, at *9, n.4 (S.D. Ohio June 28, 2012) (Report and Recommendation) (citation omitted), *adopted*, 2012 WL 3779326 (S.D. Ohio Aug. 31, 2012).

[5] The Listing specifies that the reported $FEV_1$ results should be the largest of at least three satisfactory forced expiratory maneuvers and the test should be repeated after an administration of a bronchodilator. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00(E). The Listing cautions that "Pulmonary function studies should not be performed unless the clinical status is stable (e.g., the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness)." *Id.*

[6] Plaintiff's height was variously recorded as 62"-63", which corresponds to a listing level $FEV_1$ of 1.15 (Tr. 418, 660, 661, 681); 64", which corresponds to a listing level $FEV_1$ of 1.25 (Tr. 602, 696); and 66" (Tr. 410, 662), which corresponds to a listing level $FEV_1$ of 1.35. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.01, Table I; *see* Tr. 656. Dr. Farber noted the recorded height of 66" was not correct and "should be 64 or 63 [inches]." (*Id.*). Plaintiff testified at the hearing that she is 5'4" (64"). (Tr. 99). The ALJ gave plaintiff the benefit of the doubt and applied the higher $FEV_1$ value of 1.35 corresponding to a height of 66", the tallest height reported in the medical records. (Tr. 72).

wheezes and rhonchi; Dr. Onadeko opined that plaintiff's respiratory impairment imposes debilitating limitations; and the ALJ found that she suffers from additional severe impairments (myocardial infarction and obesity), which plaintiff alleges "could impact her breathing" (Tr. 71). (Doc. 13 at 17). Based on this evidence, plaintiff seeks a remand of her claim to the ALJ for consideration of whether her breathing impairment equals Listing 3.02. (*Id*.).

In response, the Commissioner argues that plaintiff has not satisfied her burden to show that her impairments medically equaled Listing 3.02. (Doc. 18 at 4-7). The Commissioner contends that the ALJ discussed the opinion of the medical expert, Dr. Mark Farber, M.D., who reviewed the medical record and completed medical interrogatories; the ALJ properly found that pulmonary function results showing $FEV_1$ values that satisfied the Listing were not reliable for reasons the ALJ explained in his written decision; and the ALJ reasonably concluded that plaintiff's impairments did not medically equal a Listing. (*Id*. at 5-7).

The ALJ is required to "consider all evidence in [the claimant's] case record" in making the disability determination and to "consider the medical severity of [the claimant's] impairments" at step three of the sequential evaluation process. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 365 (6th Cir. 2014) (citing 20 C.F.R. §§ 404.1520(a)(3), 404.1520(a)(4)(iii); *Bowie v. Commissioner of Social Sec.*, 539 F.3d 395, 400 (6th Cir. 2008)). Contrary to plaintiff's allegation, the ALJ considered the severity of plaintiff's respiratory impairment at step three of the sequential evaluation process and evaluated whether her impairment met or equaled Listing 3.02. (Tr. 72-74). The ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. (Tr. 72). In making this finding, the ALJ thoroughly considered the findings of the medical expert, Dr. Farber, who reviewed the medical evidence of record, answered interrogatories, and

7

opined that plaintiff's COPD did not meet or equal Listing 3.02. (*Id.*, citing Tr. 652-81). The

ALJ noted that Dr. Farber found that plaintiff's COPD did not meet Listing 3.02 and that Dr.

Farber reported "the record contains $FEV_1$ levels that do not meet or equal Listing 3.02." (Tr.

72; *see* Tr. 662, 4/23/12- 1.39; Tr. 658, 3/7/13- 1.53; Tr. 659, 3/8/13- 1.98; Tr. 578-79, 4/5/13-

1.53). The ALJ relied on Dr. Farber's opinion that although a pulmonary function test performed

on June 18, 2012, yielded an $FEV_1$ below listing level (Tr. 419, $FEV_1$ of .94 after

bronchodilator), that $FEV_1$ value was not the baseline because later studies showed higher $FEV_1$

levels. (Tr. 72, citing Tr. 660). The ALJ noted that plaintiff reported on that date that she had

run out of the medication she regularly used (Albuterol) three days prior to the test (Tr. 417-18);

the test was thus performed during an exacerbation; and testing performed less than two months

earlier showed much higher values. (Tr. 410, $FEV_1$ of 1.39 after bronchodilator). (Tr. 72). The

ALJ also found that while plaintiff had $FEV_1$ values of 1.26 on January 29, 2014 (Tr. 686) and

June 4, 2014, those results appeared to be transient because plaintiff was diagnosed with

bronchitis and pneumonia during those visits.[7]  (Tr. 72). The evidence cited by the ALJ

substantially supports his finding that plaintiff's COPD does not meet or equal the Listing.

Plaintiff has not shown that the ALJ's finding was erroneous and that her impairments

met or equaled in severity Listing 3.02A during the time period in issue as is her burden. *See*

*Forrest*, 591 F. App'x at 366 (even if the ALJ's reasoning failed to support his step-three

findings, the error was harmless because the plaintiff did not show his impairments met or

equaled a listed impairment). Plaintiff alleges that the ALJ failed to consider her additional

---

[7] The ALJ indicates these results can be found in the record at Exhs. 18F/3 and 29F/1-6. (Tr. 72). However, Exh. 29F does not appear to be part of the record before the Court.

severe impairments of myocardial infarction and obesity "which *could* impact her breathing." (Doc. 13 at 17) (emphasis added). However, the ALJ did consider whether plaintiff's obesity impacted her functioning pursuant to Social Security Ruling 02-1p[8] and found no evidence documenting additional restrictions resulting from her obesity. (Tr. 73-74). Plaintiff has not pointed to evidence to show that her obesity or heart condition imposes additional functional restrictions as is her burden at step three. *See Forrest*, 591 F. App'x at 366.

Plaintiff's second assignment of error should be overruled.

### 2. **Weight to the treating physician**

Plaintiff alleges as her first assignment of error that the ALJ erred in weighing the opinion of her treating pulmonologist, Dr. Onadeko. It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

---

[8] SSR 02-1p provides guidance on how adjudicators evaluate obesity under the sequential evaluation process. SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). SSR 02-1p provides that the Commissioner will consider the effects of obesity in determining whether an individual with obesity meets the requirements of a listing, either because the individual has another impairment that by itself meets the requirements of a listing or because the individual has an impairment that in combination with obesity meets the requirements of a listing. *Id.*, at \*5.

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(c)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(c)(3)-(6); *Gayheart,* 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also* 20 C.F.R. § 416.927(c)(2). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

10

Generally, an opinion from a medical source who has examined a claimant is given more weight than that of a source who has not performed an examination. *Id.* (citing 20 C.F.R. §§ 404.1502 and 404.1527(c)(1)). Opinions from nontreating and nonexamining sources are weighed based on the examining relationship, specialization, consistency, and supportability as well as other factors "which tend to support or contradict the opinion." 20 C.F.R. § 416.927(c)(6). However, "the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record[.]" SSR 96-6p, 1996 WL 374180 at *2.

Dr. Onadeko first saw plaintiff in the emergency room on January 28, 2013, where she was admitted for an altered mental state and heroin overdose and treated for a non-ST segment elevation myocardial infarction and acute respiratory failure. (Tr. 480-540; Tr. 590). Dr. Onadeko saw plaintiff three times after her discharge between February 26, 2013 and September 25, 2013, before he issued a medical assessment on November 11, 2013. (*Id.*; Tr. 569-88). Dr. Onadeko completed a Pulmonary Residual Functional Capacity Questionnaire on that date. (Tr. 589-95). Dr. Onadeko diagnosed plaintiff with acute respiratory failure, hypoxemia, hypercapnia, tobacco use disorder, BiPAP (biphasic positive airway pressure) dependence, and severe COPD.[9] (Tr. 590). Dr. Onadeko opined that plaintiff has COPD exacerbations precipitated by upper respiratory infections, irritants, and cold air/changes in weather. (Tr. 591). The exacerbations cause increased shortness of breath, pulmonary symptoms, and impairment. (*Id.*). The supporting clinical findings were chest examination results showing coarse rhonchi

---

[9] "Hypercapnia" is "excessive carbon dioxide in the bloodstream, typically caused by inadequate respiration." http://medical-dictionary.thefreedictionary.com/Hypercapnia. "Hypoxemia" is "[s]ubnormal oxygenation of arterial blood." http://medical-dictionary.thefreedictionary.com/Hypoxaemia.

and wheezes; office spirometry on February 26, 2013 showing $FEV_1$ 0.65L(22%); Sp02 of 95%

on 2 liters of oxygen[10]; pulmonary function testing on March 7, 2013 showing an $FEV_1$ of 1.53

(51% of predicted value), and plaintiff's six-minute walk test results showing a distance walked

of less than predicted (1050 ft./1559 ft.) with no desaturation while on oxygen. (Tr. 590). Her

medications were Advair, Albuterol inhaler, Spiriva (which Dr. Onadeko indicated she was

unable to afford),[11] and 2L of oxygen a minute. (Tr. 592). Dr. Onadeko found that plaintiff's

symptoms - shortness of breath, chest tightness, wheezing, rhonchi, and coughing - were severe

enough to frequently interfere with her attention and concentration but she was capable of

tolerating the stress of low stress jobs. (Tr. 590-92). The basis for these conclusions were: (1)

the $FEV_1$ improved to 51% of predicted on pulmonary function testing, and (2) no desaturation

while on oxygen occurred during the 6-minute walk test, but the total distance walked was less

than the predicted distance. (Tr. 592). Dr. Onadeko provided the following prognosis: "Patient

needs to quit smoking. Has mod[erately]-severe COPD with hypercapnia and hypoxaemia.

Further deterioration of lung function is expected if she continues to smoke." (Tr. 592). He

assessed plaintiff's functional capacity as follows: Plaintiff could occasionally lift 20 pounds and

frequently lift less than 10 pounds; walk less than one city block; sit for about 2 hours in an 8-

hour workday and for up to 45 minutes continuously; and stand/walk for less than 2 hours and

for 20 to 30 minutes continuously. (*Id.*). She would need to take three to four unscheduled

breaks during an 8-hour workday and she must sit an average of 15 to 30 minutes during her

breaks before returning to work. (Tr. 593-94). She could stoop for 10% of the day and crouch

---

[10] "SpO2" is "[t]he saturation of arterial blood with oxygen as measured by pulse oximetry, expressed as a percentage." http://medical-dictionary.thefreedictionary.com/SpO2.

[11] As discussed *infra* at p. 23-24, the ALJ reasonably questioned plaintiff's reported inability to afford medication based on her admissions that she smoked one-half to three packs of cigarettes per day during the period of alleged disability and in light of evidence showing she had obtained a medical card around mid-October 2012. (Tr. 84).

for 5% of the day. (Tr. 594). She should avoid all exposure to temperature extremes, high humidity, fumes/odors/dusts/gases, and cigarette smoke; she should avoid even moderate exposure to soldering fluxes; and she should avoid concentrated exposure to perfumes, solvents/cleaners and chemicals. (*Id.*). Dr. Onadeko opined that plaintiff was likely to be absent from work approximately twice a month as a result of her impairments or treatment. (Tr. 595). He concluded that plaintiff requires oxygen at least 15 hours a day for her COPD. (*Id.*).

The ALJ declined to give Dr. Onadeko's opinion "controlling weight." (Tr. 86). The ALJ found that the opinion (1) was not well supported by medically-acceptable clinical and laboratory diagnostic techniques, and (2) was not consistent with other substantial evidence in the case record. (*Id.*). Instead, the ALJ gave Dr. Onadeko's opinion "some weight." (*Id.*). Plaintiff acknowledges that the ALJ balanced the regulatory factors set forth in 20 C.F.R. § 416.920(c)(2)-(6) by noting that the ALJ gave the following reasons for discounting Dr. Onadeko's opinion: (1) the opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques; (2) the opinion was not consistent with the other substantial evidence in the case record; (3) the values yielded by pulmonary testing were not at listing level; (4) the record did not document the need for supplemental oxygen; (5) Dr. Onadeko did not provide support for the sitting/standing/walking limitations he assessed; (6) the limitations Dr. Onadeko assessed were inconsistent with plaintiff's testimony; (7) the limitations assessed were not consistent with plaintiff's activities of daily living; and (8) Dr. Onadeko had seen plaintiff only three times since their initial hospital encounter. (Doc. 13 at 9). Plaintiff argues that none of these reasons provided by the ALJ for discounting Dr. Onadeko's opinion are supported by the evidence. (*Id*. at 10-17).

Plaintiff's argument is not well-taken. To the contrary, the record demonstrates that substantial evidence supports the ALJ's analysis of the regulatory factors under 20 C.F.R. § 416.927(c)(2)-(6) and his decision to afford Dr. Onadeko's opinion only "some weight." The ALJ reasonably found that Dr. Onadeko's opinion of debilitating limitations was not well-supported by the evidence in the record and was not consistent with other substantial evidence in the case record. The ALJ relied on evidence that showed plaintiff continued to smoke, despite being on oxygen and despite repeatedly being advised to quit; she was non-compliant with treatment, which affected the reliability of her pulmonary function test results; and her condition improved with treatment. (*See* Tr. 334, 350, 390, 417, 558-59, 637, 743, 754, 767-72). The ALJ also reasonably considered that plaintiff's pulmonary function study results were not at listing level in discounting Dr. Onadeko's more extreme restrictions. As explained above, although plaintiff tested below Listing level on occasion, the medical records showing $FEV_1$ values that exceeded Listing level suggested that the low $FEV_1$ values were related to noncompliance with medication, cigarette use, and exacerbation due to illness. The ALJ properly considered plaintiff's fluctuating $FEV_1$ values as one factor in affording Dr. Onadeko's opinion only "some weight."

The ALJ further reasonably found that Dr. Onadeko did not provide objective support for the standing, walking, or sitting limitations he assessed.[12] Although Dr. Onadeko cited ample objective findings to support his diagnosis of a severe respiratory impairment, those findings do not explain why plaintiff's respiratory impairment imposed extreme restrictions on her ability to

---

[12] The ALJ also found Dr. Onadeko's opinion that plaintiff would need to sit for 15 to 30 minutes three to four times during an 8-hour workday to be inconsistent with the sitting limitations he imposed. (Tr. 86). The ALJ did not explain how the limitations are inconsistent, and the Court does not perceive any inherent inconsistencies in the sitting limitations assessed by Dr. Onadeko.

14

sit and precluded her from performing even a restricted range of sedentary work.[13]

In addition, substantial evidence supports the ALJ's finding that the restrictions Dr. Onadeko assessed were inconsistent with plaintiff's testimony that she can lift up to 25 pounds and with her daily activities. (Tr. 86). The ALJ relied on testimony and evidence that plaintiff spent four to five hours during the day on the computer, made her own meals, washed her own dishes, did her own laundry, tended to her self-care, vacuumed a little, and reportedly rode a bicycle to her friend's house in February 2012. (*Id.*, citing Tr. 382-88). The ALJ reasonably found this evidence of plaintiff's ability to perform "a somewhat normal level of daily activity" and to engage in physical activities that involved lifting and bending to be inconsistent with the debilitating limitations assessed by Dr. Onadeko. (Tr. 84). *See* 20 C.F.R. § 416.929(c)(3)(i) (authorizing an ALJ to consider daily activities when evaluating symptoms); *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 392 (6th Cir. 2004) (permitting an ALJ to consider daily activities such as housework in evaluating complaints of disabling pain). Plaintiff argues that additional testimony she provided concerning her symptoms, her functioning, and restrictions on her daily activities "place the evidence cited by the ALJ into context" and show that her activities of daily living are not inconsistent with Dr. Onadeko's opinion. (Doc. 13 at 15). However, the ALJ discounted plaintiff's credibility and testimony as to her debilitating symptoms for reasons he

---

[13] Sedentary work generally requires the following functional abilities:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as 'nonexertional,' such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

SSR 96-9p, 1996 WL 374185, at *3 (July 02, 1996)

thoroughly discussed in his written decision (Tr. 74-87), and plaintiff has not challenged the ALJ's credibility finding on appeal. (Doc. 13). The ALJ's finding that plaintiff's activities of daily living were inconsistent with the level of limitation found by Dr. Onadeko is well-supported by the evidence the ALJ credited, and the ALJ did not err in this regard.

The ALJ also took into consideration Dr. Onadeko's area of specialization and his treatment relationship with plaintiff in accordance with 20 C.F.R. § 416.927(c)(2), (5). The ALJ acknowledged that Dr. Onadeko is a treating source and a pulmonary specialist; however, the ALJ noted that Dr. Onadeko had seen plaintiff a total of only three times after his initial encounter with her following her emergency room admission for a drug overdose. (Tr. 86). Plaintiff argues this is "not insignificant treatment" and that the amount of contact Dr. Onadeko had with plaintiff puts him in "an optimal position" to render an opinion on plaintiff's functional limitations, or at least in "a much better position" than the examining and reviewing physicians of record. (Doc. 13 at 16). While the opinions of treating physicians are generally accorded greater weight than one-time examining or non-examining physicians' opinions, *Walters*, 127 F.3d at 529-530, the ALJ is not required to credit a treating physician's opinion based solely on the nature of the treatment relationship; instead, the ALJ must balance several factors in determining whether to defer to the treating physician's opinion. *See* 20 C.F.R. § 416.927(c)(2)-(6). The ALJ fulfilled his duty here by considering Dr. Onadeko's status as a treating physician and his area of specialization, while also acknowledging the Dr. Onadeko had seen plaintiff only a handful of times and balancing the remaining factors outlined in § 416.927(c)(2)-(6). Moreover, under the particular circumstances of this case, the ALJ was not required to give the opinion of Dr. Onakedo more weight than the opinion of the medical expert, Dr. Farber, based on the treating physician's area of specialization given that Dr. Farber likewise specialized in the

area of pulmonary disease.  (Tr. 86).  *Cf.* 20 C.F.R. § 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  Plaintiff has shown no error in this regard.

Finally, plaintiff challenges the ALJ's reliance on Dr. Farber's opinion that the record did not document a need for supplemental oxygen as a basis for discounting Dr. Onadeko's opinion. (*See* Tr. 86, citing Tr. 668- Dr. Farber noted on Dr. Onadeko's report: "no documentation for [oxygen] requirement but even if she requires, still can perform sedentary work").  Plaintiff characterizes Dr. Farber's opinion as "confusing" in light of plaintiff's severe COPD, various test results, and Dr. Farber's indication in his RFC assessment that plaintiff may require a workplace accommodation for an oxygen tank (Tr. 654).  (Doc. 13 at 12-13).  However, the Court need not address whether the ALJ's reliance on this aspect of Dr. Farber's opinion was justified.  Even if Dr. Farber's finding that plaintiff did not require supplemental oxygen is not supported by the evidence, the remaining reasons the ALJ gave for discounting Dr. Onadeko's opinion provide substantial support for the ALJ's decision.

Thus, the ALJ thoroughly evaluated the medical and other evidence of record and gave "good reasons" that are substantially supported by the record for discounting Dr. Onadeko's opinion.  Instead of crediting Dr. Onadeko's assessment, the ALJ gave "significant weight" to the opinion of the medical expert, Dr. Farber, a physician with a specialization in pulmonary disorders.  (Tr. 84).  The ALJ found that Dr. Farber had an opportunity to review a majority of the medical evidence of record and that his opinions were well-supported by the explanations he provided and the objective evidence he cited.  (Tr. 84-85).  As discussed earlier, Dr. Farber reviewed the medical evidence of record and answered medical interrogatories on April 28,

17

2014.  (Tr. 652-81).  Dr. Farber opined that plaintiff's COPD did not meet Listing 3.02.[14]  (Tr.

85).  Although a pulmonary function test performed on June 18, 2012, yielded an $FEV_1$ below

listing level (Tr. 419), Dr. Farber opined that the value yielded by testing on this date was not the

baseline because later studies showed higher $FEV_1$ levels that did not meet or equal Listing 3.02.

*See* Tr. 658, 3/7/13- 1.53; Tr. 659, 3/8/13- 1.98; Tr. 578-79, 4/5/13- 1.53).  Dr. Farber opined that

plaintiff may need an accommodation for oxygen supplementation at the workplace; she can

lift/carry 10 pounds occasionally and less than 10 pounds frequently, sit for up to six hours in an

8-hour workday, and stand/walk for up to two hours in an 8-hour workday; she can occasionally

climb stairs/ladders, crawl and kneel; she must avoid concentrated exposure to respiratory

irritants/fumes/dusts/gases; and she should require no more than usual breaks during the

workday.  (Tr. 654).  Dr. Farber opined that plaintiff would miss less than one day of work each

month due to illness.  (*Id.*).  Dr. Farber reported that smoking cessation would improve plaintiff's

lung function and symptoms and might obviate the need for supplemental oxygen, and avoiding

alcohol and other drugs would minimize the occurrence of acute illnesses.  (Tr. 655).

The ALJ was entitled to rely on Dr. Farber's assessment for the reasons the ALJ stated.

*See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989) (medical

expert testimony consistent with the evidence of record can constitute substantial evidence to

support the Commissioner's decision).  The ALJ considered the degree to which Dr. Farber

provided supporting explanations for his opinions and the degree to which his opinion

considered all of the pertinent evidence in the record, including the opinions of treating and other

examining sources, as required under the governing regulations.  *See* 20 C.F.R. § 416.927(c)(3)

---

[14] The ALJ stated that Dr. Farber indicated in his interrogatory responses that plaintiff's COPD did not meet Listing 3.02 because the evidence did not reflect "FEV values equal to or less than 1.65."  (Tr. 72, citing Tr. 652-81).  This is an apparent typographical error in the ALJ opinion as Dr. Farber indicated that he considered the listing level $FEV_1$ value to be no greater than 1.35, which corresponds to a height of 66-67" without shoes.  (Tr. 656).

(a non-treating source's opinion is weighed based on how well-supported by evidence the opinion is). The ALJ's decision to afford Dr. Farber's "significant weight" is supported by substantial evidence.

Thus, for the reasons discussed above, the ALJ did not err in evaluating the medical opinion evidence related to plaintiff's physical impairments. The ALJ's decision to give Dr. Onadeko's opinion "some weight" and to rely instead on the opinions of the medical expert, Dr. Farber, is substantially supported by the record. Plaintiff's first assignment of error should be overruled.

### 3. Weight to the consultative examining psychologist

Plaintiff alleges that the ALJ erred by assigning only "some weight" to the report of the consultative examining psychologist, Dr. Kevin L. Corbus, Psy.D. (Doc. 13 at 18-19). Plaintiff alleges that the ALJ's reasons for giving reduced weight to Dr. Corbus' report are not supported by the record. The Commissioner argues in response that the ALJ's reasons are substantially supported by the record. (Doc. 18 at 17-20)

Dr. Corbus evaluated plaintiff at the request of the state agency in April 2012. (Tr. 401-06). Plaintiff reported to Dr. Corbus that she maintained good relationships with family but did not socialize with anyone. (Tr. 401-02). She reported that she had a history of extensive mental health treatment but was not currently participating in such treatment. (Tr. 402). She reported she had been prescribed anxiety medication but could not afford it at the time of the evaluation. (Tr. 402). She had never been hospitalized for psychiatric issues. (*Id*.). At the time of the evaluation, plaintiff had been working at Burger King for 3 years and currently worked 15-25 hours every two weeks but felt she could not work more hours due to anxiety and COPD. (Tr. 403). Plaintiff reported that she had never been fired and had no history of interpersonal

problems with supervisors, coworkers or customers. (Tr. 403). She reported "some history" of difficulty maintaining an adequate pace at past jobs. (*Id*.). Plaintiff described her daily routine as waking and going to bed at variable times, watching TV, sleeping, and helping around the house by doing the dishes and vacuuming "a little at a time because of the COPD." (*Id*.). Dr. Corbus reported that plaintiff's grooming and hygiene were adequate, she was cooperative and volunteered information and details readily, and she maintained good eye contact. (*Id*.). He observed that plaintiff was extremely shaky and tearful and constantly tapped her feet during the evaluation. (*Id*.). Flow of conversation and thought were normal except that plaintiff's rate of speech was "slowed." (*Id*.). Her mood appeared anxious with congruent affect. (Tr. 404). She reported symptoms of mania and two to three manic phases each week lasting from a couple of hours to a couple of days. (*Id*.). Plaintiff reported being currently depressed with symptoms of low self-esteem, concerns about the future, sadness, tearfulness, lack of energy, and poor appetite. (*Id*.). She demonstrated symptoms of anxiety during the examination as she was shaky and fidgety, and she reported having panic attacks 4 to 5 times each week during which she is unable to catch her breath and does not want to be around anyone. Her mental content was normal. She was oriented in all spheres. Her cognitive functioning was in the average range. Her attention and concentration were poor, her ability to abstract was fair, and she demonstrated some difficulties with memory during the evaluation. (*Id*.). She could understand and follow directions during the evaluation and her performance on memory/recall tasks was average. (*Id*.).

Dr. Corbus diagnosed plaintiff with mood disorder NOS, anxiety disorder NOS, and cocaine dependence (in sustained full remission). (Tr. 405). He assigned her a GAF score of

50.[15]  (*Id.*).  Dr. Corbus opined that plaintiff was "likely to have significant difficulties with job related tasks due to physical and mental health problems"; plaintiff's anxiety appeared to be significant and would likely distract her often at work and in other settings; she was likely to respond appropriately to coworkers in a work setting; and she was somewhat able to respond appropriately to work stressors and situations.  (Tr. 405-06).

The ALJ discounted Dr. Corbus' assessment on three grounds.  First, the ALJ found the assessment was based heavily upon plaintiff's self-reports, which the ALJ found were "less than fully credible."  (Tr. 79).  Second, the ALJ discounted the assessment based on plaintiff's lack of significant mental health treatment, which the ALJ found indicated her mental health symptoms were not as debilitating as she presented to Dr. Corbus.  (*Id.*).  Third, the ALJ discounted the assessment based on the "consistent normal psychiatric findings on other examinations," which the ALJ found likewise cast doubt on the debilitating nature of the symptoms presented by plaintiff.  (*Id.*).  Plaintiff acknowledges that the ALJ discounted Dr. Corbus' assessment on these grounds but alleges the ALJ's reasons are not supported.  (Doc. 13 at 18-19).  The Court disagrees and finds that the ALJ properly weighed Dr. Corbus' opinion and gave valid reasons for declining to credit his assessment.

First, the ALJ properly considered the extent to which Dr. Corbus' opinion was supported by the objective and clinical evidence, as opposed to plaintiff's subjective allegations alone.  *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.")  Objective evidence in the psychiatric/psychological context includes "medical signs,"

---

[15] "GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning."  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006).  A GAF score of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

20 C.F.R. § 416.912(b)(1), which are defined as "*psychological abnormalities which can be observed, apart from your statements* (symptoms). . . . Psychiatric signs are *medically demonstrable* phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 416.928(b). Here, it appears that Dr. Corbus relied heavily on plaintiff's subjective allegations in rendering his assessment. For instance, in assessing plaintiff's ability to understand, remember and carry out instructions, Dr. Corbus found that plaintiff was able to follow instructions in the evaluation and that her performance on memory/recall tasks was average. (Tr. 405). However, he appears to have relied on plaintiff's self-report that she will not fully complete tasks at times because she will need to remove herself from anxiety-producing situations. (*Id*.). In assessing plaintiff's ability to maintain attention, concentration, persistence and pace to perform simple and multi-step tasks, Dr. Corbus relied on plaintiff's reports that she had a history of difficulty in maintaining adequate pace at past jobs, even though she was currently working, and that her depression and anxiety "will [] cause her to be inconsistent at work, and have poor pace and persistence." (Tr. 406). In addition, Dr. Corbus noted that plaintiff had no history of interpersonal difficulties in a work setting, she was likely to respond appropriately to coworkers in a work setting, and she did not have a significant history of violent or aggressive outbursts; however, he noted plaintiff's subjective report that she will sometimes be short-tempered and verbally aggressive when she is anxious. (*Id*.). Finally, Dr. Corbus appears to have relied exclusively on plaintiff's self-reported difficulty in responding appropriately to work pressure when assessing her ability in this area. (*Id*.). Dr. Corbus assessed plaintiff's abilities and limitations in this area of functioning as follows:

22

> The claimant reported extensive mental health treatment history and is not
> currently participating in mental health treatment. Ms. Griggs does not take
> psychiatric prescription medication to help manage symptoms and continues to
> experience difficulties. *Based on her self-reported history*, the claimant is
> somewhat able to respond appropriately to work stressors and situations. The
> claimant is currently experiencing significant stressors, and does not appear to
> have adequate social supports in place to effectively cope with additional
> stressors. *The claimant stated* she experiences some success at her part time job,
> but prior to the worsening of her anxiety and physical condition she was able to
> work full time. *She stated* her ability to respond appropriately at work is
> dependent upon her mood at that time, but that generally she has difficulty.

(*Id.*) (emphasis added). Thus, the ALJ reasonably determined that Dr. Corbus relied heavily on

plaintiff's self-reported symptoms rather than objective evidence in reaching his conclusions as

to her mental functional limitations. (Tr. 79). In light of the ALJ's finding that plaintiff was not

fully credible, which plaintiff has not challenged, the ALJ was justified in discounting Dr.

Corbus' opinion on the ground he relied largely on plaintiff's self-reported symptoms.

Second, the ALJ reasonably discounted Dr. Corbus' assessment in light of plaintiff's

history of a lack of significant mental health treatment. (*Id.*). Plaintiff simply notes in response

to this finding that she did not have health insurance until recently and that she had begun mental

health treatment in March 2014, long after abnormal psychiatric findings were first noted on her

examinations and approximately two years after Dr. Corbus issued his assessment. (Doc. 13 at

19, citing Tr. 101-02, 627-51). However, plaintiff has not pointed to any evidence in the record

to show that her lack of insurance precluded her from obtaining mental health treatment

throughout the period of alleged disability. In fact, the ALJ noted that the evidence showed that

plaintiff had obtained a medical card around October 15, 2012 (Tr. 458-59) and that she admitted

smoking one-half to three packs of cigarettes per day during the applicable period with her

family members often paying for her cigarettes. (Tr. 84). The ALJ reasonably concluded based

on this evidence that plaintiff could have afforded some treatment or medication. *See Moore v.*

*Commissioner of Social Sec.*, 573 F. App'x 540, 542-43 (6th Cir. 2014) (ALJ reasonably

concluded that plaintiff's failure to pursue treatment greatly eroded her credibility where she

testified she could not afford treatment but she continued to purchase up to three packs of

cigarettes a day and the evidence showed she had obtained medical insurance long before the

alleged onset date) (citing *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th

Cir. 1990) ("concluding that the claimant's failure to seek treatment undercut his complaints of

disabling symptoms"). The ALJ therefore was entitled to discount Dr. Corbus' assessment of

debilitating mental functional limitations based on plaintiff's failure to pursue treatment during

the alleged period of disability.

Finally, plaintiff alleges that the record does not support the ALJ's decision to discount

Dr. Corbus' assessment on the ground there were consistently normal psychiatric findings on

examination. (Doc. 13 at 19; *see* Tr. 79). Plaintiff contends the ALJ's finding is unsupported

because there were four dates on which abnormal mental status findings were made: Dr. Corbus'

April 2012 assessment (Tr. 401-06), and four treatment sessions at St. Aloysius on March 4,

2014 (Tr. 647), March 24, 2014 (Tr. 628), and May 20, 2014 (Tr. 713-15). (Doc. 13 at 19).

Plaintiff alleges that Dr. Corbus observed numerous abnormalities, and on some or all of the

above dates her treating providers noted that she appeared nervous, restless, fidgety, anxious and

mistrustful; her affect and facial expressions were blunted; her mood and affect were anxious,

depressed and constricted; she had a mild impairment of attention and concentration; and her

insight and judgment were limited to fair. (*Id.*). However, as the Commissioner notes, the

record also documents normal mental status findings made during the course of many more

medical appointments. (Doc. 18 at 20). The ALJ noted in his written decision that several

examination reports noted that plaintiff was alert and oriented x3 and had a normal mood and

24

affect.  (Tr. 77, citing Tr. 335- plaintiff alert and oriented x3, normal affect reported in June

2011 emergency room report; Tr. 349-50- normal mood and affect report in September 2011

emergency room report; Tr. 390-98- plaintiff alert and oriented x3, normal mood and affect and

behavior reported in January 2012 emergency room report; Tr. 435-52- normal mood and affect

and behavior reported in October 2012 emergency room report; Tr. 458-59- normal mood and

affect, behavior, judgment, and thought content reported in October 2012 emergency room

report; Tr. 621-22, plaintiff was alert and oriented x3, affect, conversation and mood were

normal, and no abnormal thinking was noted in September 2013 emergency room report).  Given

that these normal mental status findings were made during several emergency room visits that

spanned more than two years, the ALJ's decision to give reduced weight to Dr. Corbus'

assessment in light of consistently normal psychiatric findings is substantially supported.

      The ALJ provided valid reasons which are substantially supported by the evidence for

giving only "some weight" to Dr. Corbus' assessment of plaintiff's mental functional limitations.

The ALJ reasonably discounted Dr. Corbus' assessment on the grounds it was based in large part

on plaintiff's subjective reports and was inconsistent with plaintiff's lack of mental health

treatment history and with the consistent reports of normal psychiatric findings found in other

examination reports throughout the record.  *Cf. Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977,

979-80 (6th Cir. 2011) (finding the ALJ appropriately discounted treating physician's opinion

which was "based largely on plaintiff's subjective complaints and was not supported by other

medical evidence in the record").  Accordingly, plaintiff's third assignment of error should be

overruled.

25

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **AFFIRMED.**

Date: _10/17/16_

Karen L. Litkovitz
United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ANITA L. GRIGGS,
      Plaintiff,

      vs.


COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:15-cv-619

Barrett, J.
Litkovitz, M.J.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).